**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| ENBRIDGE PIPELINES (OZARK), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-CV-117-TCK-PJC |
| | ) | |
| DAVID A. BAILEY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the Court is Plaintiff's Motion for Preliminary Injunction (Doc. 10).  A hearing on this motion was held Thursday, July 9, 2009.

**I.      Background**

Plaintiff Enbridge Pipelines (Ozark) LLC ("Enbridge") owns and/or operates approximately 17,600 miles of crude oil pipelines in the United States.  Defendant David A. Bailey ("Defendant") owns property in Creek County, Oklahoma ("Property").  A Right-Of-Way Grant ("ROW Grant"), which covers and affects the Property, was originally given in 1948 to the Texas-Empire Pipeline Company by Defendant's predecessor in interest, Marcus Wilson McGuire.  Enbridge is the successor to the rights of the Texas-Empire Pipeline Company.  The ROW Grant authorizes Enbridge to "lay, operate and maintain a pipe line for the transportation of oil, gas, gasoline, or other liquids" on the Property.  (Ex. 1.)[1]  Pursuant to the ROW Grant, Enbridge and its predecessors have installed, operated, and maintained a pipeline that travels across the Property ("Pipeline").  Enbridge's right-of-way extends approximately twenty-five feet from either side of the center of the Pipeline.

---

[1]    All exhibits cited herein refer to those admitted at the July 9, 2009 hearing.

A.     History of Fill Material on Defendant's Property

According to Defendant, he began completing "fill work" on his Property approximately five years ago in order to improve the land.  Sometime thereafter, Defendant contacted Enbridge Right-of-Way Technician John Peterman ("Peterman") to notify Peterman that he was completing work on the Property.  Defendant and Peterman met on the Property, discussed the location of the Pipeline, and the scope of fill work that Defendant intended to complete on the east end of the Property.  Peterman told Defendant that he could place "a couple" feet of fill material on top of the Pipeline.  According to Peterman, he also told Defendant that the fill material had to be comprised of "clean dirt" – *i.e.* topsoil that was free of large rocks.

On June 11, 2008, Peterman received an Aerial Patrol Report noting that "fill dirt with concrete chunks" had been pushed over Enbridge's right-of-way on the east side of Defendant's Property.  (Ex. 7.)  In response to this report, Peterman visited the Property and viewed bulldozers pushing large rocks toward Enbridge's easement.  Peterman spoke to the operator of the bulldozer and inquired as to how far he was planning on pushing the rocks.  The operator responded by telling Peterman that he would have to contact Defendant.  Peterman then stopped by Defendant's office, was told Defendant was "gone for the day," and left a message for Defendant regarding the concrete chunks that were being pushed over Enbridge's right-of-way.

Peterman received another Aerial Patrol Report on June 30, 2008, indicating that there was additional dirt covering Enbridge's right-of-way on Defendant's Property.  According to Peterman, the fill material was now covering the Pipeline, causing him concern.  Peterman spoke to his supervisor, Senior Right-of-Way Officer Wes Smith ("Smith"), who then assumed responsibility for the situation on Defendant's Property.  A few days later, on July 2, 2009, Smith visited Defendant's

2

Property and viewed large piles of concrete and rebar covering Enbridge's Pipeline, which he photographed.  (*See* Ex. 3.)  Smith testified that he spoke to Defendant's daughter about the "dumping" occurring over the Pipeline and told her that it needed to stop.  Smith gave his card to Defendant's daughter and told her to have Defendant call him as soon as possible.  According to Smith, Defendant never made such a phone call.

Enbridge received two additional aerial reports – dated August 18, 2008 and September 2, 2008 – indicating Defendant was placing additional fill material on Enbridge's right-of-way.  After receipt of the September 2, 2008 report, Smith called Defendant and in the ensuing conversation, Defendant told Smith that he was placing concrete on the easement.  Smith responded by telling Defendant that he was not permitted to take such action.  According to Smith, Defendant then stated that "it was his land, he could do what he wanted to, and if they wanted to stop him, Enbridge would have to get an injunction."  Thereafter, on October 6, 2008, Enbridge filed an action against Defendant in the District Court in and for Creek County, State of Oklahoma ("Creek County action").[2]

Subsequent to the filing of the Creek County action, the parties engaged in various discussions in an attempt to resolve this conflict.  Specifically, on January 21, 2009, the parties met and Defendant agreed not to place additional fill material on Enbridge's easement.  However, on February 17, 2009, an Enbridge maintenance crew observed additional fill material on the right-of-way on Defendant's Property.  (*See* Ex. 5.)  Enbridge then filed suit in this Court on March 4, 2009.

---

[2] The Creek County action was subsequently dismissed.

3

B.      Current State of Fill Material

At the July 9, 2009 hearing, the parties presented testimony regarding the current state of Enbridge's right-of-way.  Defendant testified that he has pushed the "rough" portions of the fill material – *i.e.*, the large concrete chunks – to the south of the right-of-way on the east side of his Property.  Therefore, according to Defendant, the fill that currently remains over the right-of-way on the east side of his Property is largely free of concrete material and measures approximately ten feet in depth.  Smith visited Defendant's Property on Tuesday, July 7, 2009 and testified that, during such visit, he viewed ten to fifteen feet of fill material covering approximately 200 feet of the Pipeline on the east side of Defendant's Property.  With regard to the west side of Defendant's Property, Defendant testified that this fill material is comprised of sand, dirt, and asphalt and measures between one and one and a half feet in depth.

## II.     Discussion

Enbridge now moves for a preliminary injunction "(1) prohibit[ing] [Defendant] from depositing any additional fill material on Enbridge's pipeline right-of-way on [Defendant's] property and from otherwise interfering with Enbridge's operation and maintenance of its pipeline; and (2) requir[ing] [Defendant] to immediately remove all fill material previously placed on Enbridge's pipeline right-of-way."  (Mot. for Prelim. Inj. 1.)

A preliminary injunction is appropriate when: "(1) the movant will suffer irreparable harm unless the injunction issues; (2) there is a substantial likelihood the movant ultimately will prevail on the merits; (3) the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party; and (4) the injunction would not be contrary to the public interest." *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1254-55 (10th Cir. 2006) (citing *Kiowa Indian Tribe*

4

*of Okla. v. Hoover*, 150 F.3d 1163, 1171 (10th Cir. 1998)).  Three types of preliminary injunctions are disfavored: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that he could recover at the conclusion of a full trial on the merits.  *See Westar Energy Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F. 3d 973, 975 (10th Cir. 2004).  These injunctions require a strong showing of two factors: likelihood of success on the merits and balance of the harms.  *Westar Energy Inc.*, 552 F.3d at 1224.  Enbridge admits that because the relief it seeks is mandatory – *i.e.*, it affirmatively requires Defendant to act in a particular way – the requested injunction falls into the disfavored category.  *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1261 (10th Cir. 2005) (stating that an injunction is mandatory if "the requested relief affirmatively requires the nonmovant to act in a particular way, and as a result . . . places the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction").

### A.    Irreparable Harm

A plaintiff satisfies the irreparable harm requirement by demonstrating "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).  Purely speculative harm will not suffice, but "[a] plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative" and will be held to have satisfied his burden.  *Id.* (internal citations omitted).  Further, in determining this factor, the court should further assess "whether such harm is likely to occur before the district court rules on the merits."  *Id.*

Enbridge has successfully demonstrated that there is a significant risk of irreparable harm if the requested preliminary injunction is not granted. First, with regard to the east side of Defendant's Property, the presence of ten to fifteen feet of fill material over Enbridge's right-of-way could result in the following: (1) damage to the Pipe's coating and/or cathodic protection system; (2) a delay in discovering a leak in the Pipeline, increasing the chance of a rupture; and (3) difficulty in accessing the Pipeline in order to remedy any such leak or other emergency. Specifically, with regard to Enbridge's ability to access the Pipeline in the case of an emergency, Enbridge demonstrated that it would take additional time to reach the Pipeline through the fill material, multiplying the severity of any problem and creating an unstable environment to the potential detriment of Enbridge's workers and the surrounding environment. These concerns are especially exacerbated because, as testified by Smith, Enbridge has previously found defects in the portion of the Pipeline under Defendant's Property.[3]

Courts faced with similar facts have found irreparable injury from the potential threats cited by Enbridge. For example, in *Texas Eastern Transmission, LP v. Perano*, 2005 WL 289932, No. 04-3915 (E.D. Pa. Feb. 4, 2005), a natural gas pipeline company moved for a preliminary injunction to prevent the interference with the use of its right-of-way after the defendant placed a mobile home on the pipeline company's right-of-way. The court found that the presence of the mobile home caused irreparable harm because without the injunction, the company's ability to "inspect, maintain, and repair the pipeline, as required by federal regulations" was compromised. *Id.* at *8. The court stated:

---

[3] Specifically, Smith testified that sometime during 2006, Enbridge had to expose the Pipeline under Defendant's Property because of a "cathodic protection issue." A year later, Enbridge completed an internal inspection of the Pipeline because of a "detected anomaly."

> A cluttered right of way inhibits Texas Eastern's ability to perform the aerial patrol and vehicular surveillance by decreasing visibility. Interference with the right of way also impacts Texas Eastern's ability to repair the pipelines efficiently. . . . If there are mobile homes or other structures on the right of way, Texas Eastern has to move the structures before responding to the problem with the pipeline. Structures on the right of way also inhibit Texas Eastern's ability to locate the site of pipeline leaks. Because pipeline leaks and ruptures lead to the possibilities of explosions, interference with Texas Eastern's right of way limits its effectiveness in responding to major public safety concerns. . . . The court finds that the above factors demonstrate that Texas Eastern will suffer irreparable harm in the absence of an injunction. Without conducting proper maintenance, inspection, and repair, Texas Eastern's pipeline poses a very serious threat of danger to life and property.

*Id.* at *8-*9 (affirmed in *Texas Eastern Transmission, LP v Perano*, 2007 WL 1157145, No. 05-1720, at *2 (3d Cir. 2007)); *see Columbia Gas Transmission Corp. v. Tarbuck*, 845 F. Supp. 303, 309 (W.D. Pa. 1994) (finding irreparable harm prong satisfied in an action by a pipeline company against landowner who placed dirt and rock on the company's pipeline, in part because the "excess cover" on the pipeline caused "potential harm" to the surrounding community and environment in the form of a potential "gas leak"); *Texas Eastern Transmission Corp. v. Giannaris*, 818 F. Supp. 755, 760 (M.D. Pa. 1993) (finding the irreparable harm prong satisfied in suit by pipeline company to enjoin interference with pipeline right-of-way on the basis of the serious threat of danger to both the public and the environment without proper pipeline inspections and maintenance).

As argued by Enbridge, it is additionally harmed because the fill material covering the Pipeline on the east side of Defendant's Property prevents Enbridge from complying with general regulations regarding the inspection and maintenance of the Pipeline. Specifically, Enbridge is unable to inspect the surface conditions on or adjacent to the Pipeline with the presence of the fill material. *See* 49 C.F.R. § 195.412 (requiring pipeline operators to inspect surface conditions "on or adjacent to each pipeline right-or way" at least 26 times each calendar year). Further, the portion

of the Pipeline traversing Defendant's Property has been determined to lie in a "High Consequence Area," which makes Enbridge subject to additional stringent regulations. *See id.* at § 196.452 (outlining "pipeline integrity management" requirements for pipeline in High Consequence Areas). Under these regulations, Enbridge is required to, *inter alia*, develop a program to manage pipeline integrity, take "prompt action to address all anomalous conditions" discovered in the pipeline, be able to "immediately repair" the pipeline, and take measures to "prevent and mitigate the consequences of a pipeline failure." *Id.* at § 195.452 (b), (h) & (i). The placement of ten to fifteen feet of fill material over Enbridge's Pipeline compromises Enbridge's ability to comply with such regulations, causing it additional irreparable harm. *See Columbia Gas Transmission Corp.*, 845 F. Supp. at 309 (finding irreparable harm prong satisfied in part because placement of materials on pipeline "affect[ed] the ability of [pipeline company] to comply with Federal regulations, which could subject [it] to civil and criminal penalties").

The Court's analysis as to this factor differs with regard to the fill material located on the west side of Defendant's Property, however. The testimony presented to the Court indicates that the depth of such fill material is minimal compared to that of the east side. Further, the fill material on the west side does not contain the concrete and steel materials that have characterized the fill material on the east side of the Property. Therefore, in its current state, the fill material on the west side of Defendant's Property does not cause a significant risk of irreparable harm if it is not removed from Enbridge's right-of-way. This risk of harm would increase and mirror that on the east side, however, were Defendant to add additional fill material on the west side of his Property. Accordingly, although Enbridge has not shown irreparable harm sufficient to require Defendant to "immediately remove all fill material" from the west side (Mot. for Prelim. Inj. 1), it has

demonstrated a significant likelihood of harm if Defendant is not "prohibit[ed] . . . from depositing any additional fill material on Enbridge's pipeline right-of-way," (*id.*).

### B.    Balance of Threatened Injury and Damage Caused by Proposed Injunction

After determining the harm that would be suffered by the moving party if the preliminary injunction is not granted, the court must then weigh that harm against the harm to the defendant if the injunction is granted.  *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140,  1149 (D. Kan. 2007).  Enbridge must make a strong showing on this factor since it seeks a mandatory injunction.  *See Westar Energy Inc.*, 552 F.3d at 1224.

The Court finds that this factor weighs strongly in favor of Enbridge.  Were the Court to grant the preliminary injunction requested by Enbridge, the only harm befalling Defendant would be the cost of removing the fill material from Enbridge's right-of-way.  This cost could be adequately compensated by monetary damages and is small compared to Enbridge's compromised ability to inspect, maintain, and repair the Pipeline, which could result in a Pipeline leak or rupture. *See Texas Eastern Transmission, LP* , 2005 WL 289932, at *9 (finding harm befalling defendant in relocating mobile home off of pipeline was small compared to the harm Texas Eastern would suffer in the absence of an injunction when defendant's harm could be compensated by money damages and "the presence of structures within Texas Eastern's right-of-way . . . compromise[d] [Texas Eastern's] ability to inspect, repair, and maintain its pipelines safely and effectively"); *Columbia Gas Transmission Corp.*, 845 F. Supp. at 309 (stating "it is clear that a preliminary injunction will not result in even greater harm to [the landowner]" because the cost to remove the excess dirt and rock from the pipeline was "minimal" compared to the cost that would be incurred by the pipeline company).

Further, the argument presented before the Court at the July 9, 2009 hearing indicates that it is Defendant, rather than Enbridge, who can more efficiently remove the fill material from the right-of-way.  Were Enbridge to remove the material, it would be required to load it offsite at additional expense.  Defendant is able to remove the material at less cost since he can simply place the fill material in a different location on his Property, giving additional support to a finding for Enbridge on this factor.

  **C.**  **Public Interest**

In considering the public interest factor, the court is permitted to inquire whether there are policy considerations that bear on whether an injunction should issue. 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.4.  The Court finds that the public interest is best met by granting the preliminary injunction.  As outlined above, the existence of fill material on Enbridge's right-of-way increases the risk of a Pipeline leak or rupture, which could adversely affect the surrounding community.  Further, it is in the public's interest for Enbridge to comply with federal guidelines regarding the inspection, maintenance, and repair of its Pipeline.  *See Texas Eastern Transmission, LP*, 2005 WL 289932, at *10 (finding the preliminary injunction was in the public's interest because "[g]as pipeline leaks and ruptures have the potential to lead to explosions" and the injunction minimized "the risk of serious harm to life and surrounding property") (also considering the fact that it was in the public's interest for Texas Eastern to comply with federal regulations and that failure to abide by such regulations could result in the cut off of natural gas services to Texas Eastern's customers); *Columbia Gas Transmission Corp.*, 845 F. Supp. at 309 (finding "the public interest will clearly be served by a preliminary injunction [because] the inability of [the pipeline company] to accurately locate, inspect, and test [the pipeline] due to excess cover

poses a serious risk of harm to the public, including the loss of life, property damage and interruption of gas service"); *Texas Eastern Transmission Corp*, 818 F. Supp. at 760 (finding public interest factor satisfied in suit by pipeline company to enjoin interference with pipeline right-of-way because "[e]njoining [d]efendants from impeding [p]laintiff's access to the pipelines will further the federally protected goal that gas lines be adequately tested and maintained [and] will protect human life and the environment from the potential catastrophe that could result if the subject pipelines are not adequately maintained and inspected"). Given these considerations, the Court finds this factor weighs strongly in favor of Enbridge.

### D.    Substantial Likelihood of Success on the Merits

As previously noted, because Enbridge is seeking mandatory relief – *i.e.*, an injunction "requir[ing] Bailey to immediately remove all fill material previously placed on Enbridge's pipeline right-of-way" – the injunction requires a strong showing on the likelihood of success on the merits factor. *Westar Energy Inc.*, 552 F.3d at 1224. The Court finds Enbridge is able to meet this heightened standard.

In assessing the likelihood that Enbridge can succeed on the merits, there is no dispute that Enbridge owns a right-of-way over Bailey's Property to "lay, operate and maintain a pipe line for the transportation of oil, gas, gasoline, or other liquids" pursuant to the ROW Grant. (Ex. 1.) And, as noted by Defendant, as a "fee owner," he is able to "fully exercise his rights of ownership in any manner and for any purpose not inconsistent with [an] easement." *City of Elk City v. Coffey*, 562 P.2d 160, 163 (Okla. Ct. App. 1977). However, in this case, the testimony presented to the Court demonstrates that Defendant's exercise of ownership rights – namely, the act of dumping fill material on Enbridge's right-of-way  –  has interfered with Enbridge's ability to operate and

11

maintain its Pipeline and is therefore inconsistent with the ROW Grant.  The Court therefore finds that Enbridge has demonstrated a substantial likelihood of success on the merits. *See Texas Eastern Transmission*, 2005 WL 289932, at *5-6 (holding Texas Eastern had likelihood of succeeding on merits when the easement granted to Texas Eastern, which gave it the "right to lay, operate, renew, alter, inspect, and maintain a pipeline" over property,  was construed to apply to surface area of land and landowner's actions inhibited access to right-of-way); *Columbia Gas Transmission Corp.*, 845 F. Supp. at 309 (finding that pipeline company could meet success on the merits prong because there was no dispute that company owned right-of-way over property to "inspect, maintain, and repair" pipeline and that landowner's actions in depositing materials on pipeline "substantially interfere[d] with [company's] use of its right of way"); *Texas Eastern Transmission Corp.*, 818 F. Supp. at 760 (finding success on the merits factor satisfied in suit by pipeline company to enjoin interference with pipeline right-of-way because there was no dispute as to validity of right-of-way grant and court found defendant's actions impeded use of such easement).

## III.    Conclusion

For the reasons outlined herein, Plaintiff's Motion for Preliminary Injunction (Doc. 10) is GRANTED IN PART and DENIED IN PART.  Specifically, the Court orders as follows: (1) Defendant is hereby prohibited from depositing additional fill material on any part of Enbridge's right-of-way; and (2) Defendant is required to remove all fill material on Enbridge's right-of-way on the east side of Defendant's Property.

In order to ensure that the removal of the fill material does not inadvertently endanger the Pipeline's integrity, the parties are ordered to meet and confer in order to reach a mutually agreeable plan for the removal of the fill material.  Specifically, the parties are directed to file a Joint Plan for

Removal of Fill Material ("Joint Plan") by Friday, July 31, 2009, outlining the following: (1) the process Defendant will undertake to remove the fill material; (2) the timing for the removal of the fill material; and (3) an estimate of the cost that Defendant will incur in removing the fill material. Defendant is permitted to begin removing the fill material only after the Court has approved the Joint Plan and set an appropriate bond based on the cost estimate included in the Joint Plan.

**ORDERED this 14th day of July, 2009.**

**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**

13